KENTUCKY EDUCATION PRO-
FESSIONAL STANDARDS
BOARD, Appellant,

v.

Sue P. GAMBREL and George
W. Thompson, Appellees.

George W. Thompson, Cross–Appellant,

v.

Kentucky Education Professional
Standards Board, Cross–
Appellee.

Nos. 2000–CA–002912–MR,
2000–CA–002925–MR.

Court of Appeals of Kentucky.

June 7, 2002.

Discretionary Review Denied
June 4, 2003.

Robert E. Stopher, Robert D. Bobrow, Louisville, KY, for Appellant/Cross–Appellee.

JoEllen S. McComb, Mary E. Schoonover, Lexington, KY, for Appellees/Cross–Appellant.

Before: BARBER, McANULTY, and SCHRODER, Judges.

### OPINION

SCHRODER, Judge.

This is an appeal and cross-appeal from a judgment of the Franklin Circuit Court affirming in part and reversing in part a decision of the Education Professional Standards Board ("EPSB") which found

that a secondary supervisor and high school principal had violated KRS 161.120 and other regulations when they failed to follow KIRIS appropriate assessment practices in administering the school's 1996 KIRIS test. Upon review of the arguments on appeal and cross-appeal, we affirm those portions of the judgment which upheld the EPSB's decision and reverse those portions which overturned that decision, effectively reinstating the EPSB's order in full.

This case arises out of the March, 1996 Kentucky Instructional Results Information System (KIRIS) testing at Bell County High School. At that time, appellee, Sue Gambrel, was Bell County Schools' secondary supervisor, with an office at Bell County High School (BCHS), and appellee/cross-appellant, George Thompson, was principal of BCHS. The KIRIS test was used to assess the progress of learning in each public school in Kentucky. Schools that did poorly on the test could be sanctioned, while employees of schools that did well were eligible for cash awards.

On March 12, 1996, the Assistant Superintendent of the Bell County Schools received two phone calls from Bell County School employees alleging that individuals were cheating in the course of administering the KIRIS test. The Assistant Superintendent immediately reported the allegations to Pearl Ray Lefevers, Superintendent of Bell County Schools, who began an investigation of the matter. The results of that investigation were forwarded to the Kentucky Department of Education (KDE), Office of Curriculum Assessment and Accountability. Thereafter, KDE's Division of Management Assistance followed up with its own investigation which revealed that violations of appropriate testing practices

did occur during the March, 1996 testing at BCHS.[1] As a result of the violations, the Kentucky Education Professional Standards Board (EPSB) charged Gambrel and Thompson with eight separate counts of misconduct in office, willful neglect of duty and incompetency pursuant to KRS 161.120(1)(a), and violations of 704 KAR 20:680, which contains the Professional Code of Ethics for Kentucky School Certified Personnel. Specifically, the EPSB alleged:

a. Ms. Gambrel was the building coordinator for the KIRIS assessment that took place in March 1996 at Bell County High School, and in that role she failed to effectively carry out her responsibilities, as outlined in the KIRIS Instruction Manual for Assessment Coordinators.

b. Ms. Gambrel and Mr. Thompson knew of or were responsible for inappropriate assessment practices for the KIRIS assessment that took place in March 1996 at Bell County High School in the following areas:

* encouraging teachers to assist students in understanding the KIRIS test questions in violation of KIRIS Appropriate Assessment Practices published by the Kentucky Department of Education [limited to Mr. Thompson];

* knowing of the use of a student accountability scale created to encourage student performance, which was an inappropriate assessment practice;

* permitting and authorizing the administration of the KIRIS tests to two Bell County High School students in locations other than the high school;

* scheduling extended-time testing in an inappropriate manner;

1. As a result of the inappropriate testing practices, the KDE assigned a "novice" performance rating to all content area testing for all

11th grade students at BCHS for the 1995–1996 school year, which reduced the overall scores for Bell County more than 5 points.

\* knowing that social studies teachers reviewed the KIRIS social studies test prior to testing and formulated a "bullet sheet" of critical content about the test; and

\* knowing of the use of materials during the testing that were not allowed to be used pursuant to the KIRIS test instructions [limited to Ms. Gambrel].

c. Mr. Thompson failed to exercise the appropriate leadership in preparing his staff at Bell County High School to follow appropriate assessment practices. Specifically, Mr. Thompson is charged with delegating the responsibility for coordinating the KIRIS assessment at Bell County High School and then failing to effectively monitor and supervise that delegation of responsibility, the result being that the Bell County High School staff was not properly trained and provided guidance for test administration.

The EPSB also filed charges against eighteen (18) other BCHS teachers and Pat Bingham, the District Assessment Coordinator for the Bell County Schools. However, these charges were all settled. Gambrel and Thompson refused to settle and demanded a hearing on the charges.

The hearing on the charges against Gambrel and Thompson was held on October 5–8, 1998. On March 10, 1999, the hearing officer for the EPSB issued her findings of fact, conclusions of law, and recommended order. She found that Gambrel and Thompson were not guilty of the following three charges: knowing about a social studies "bullet sheet"; knowing of the use of prohibited materials during the testing; and permitting the administration of tests in unauthorized locations. She found that Gambrel and Thompson did violate appropriate testing practices by encouraging teachers to clarify test questions, allowing the use of the student accountability scale, and inappro-

priately scheduling extended testing time. However, she specifically found that neither Gambrel nor Thompson intentionally, knowingly or purposely violated the KIRIS appropriate assessment practices because, at the time, they were not aware that their acts violated KIRIS appropriate assessment practices. Hence, she found, as a matter of law, that their actions did not constitute a violation of 704 KAR 20:680, Section 1(3)(c)1. (maintaining the dignity and integrity of the profession) or KRS 161.120(1)(a) (misconduct, willful neglect of duty, incompetency, and violation of state school laws.) She further found that Gambrel was not the building coordinator for the KIRIS assessment in March, 1996. As to the charges against Thompson alone, the hearing officer found that he was guilty of failing to exercise appropriate leadership in delegating responsibility for the 1996 KIRIS tests, but such failure in leadership did not constitute incompetency. Also, she found that Thompson's failure of leadership was not the cause of the BCHS staff not being properly trained or provided guidance for test administration.

On June 8, 1999, the EPSB issued its findings of fact, conclusions of law, and final order. In it, the EPSB agreed with the hearing officer that Gambrel and Thompson were not guilty of knowing about a social studies "bullet sheet," knowing of the use of prohibited materials during the testing, and permitting the administration of tests in unauthorized locations, and thus, dismissed those charges. However, the EPSB rejected the recommendations of the hearing officer as to the remaining charges. Specifically, the EPSB found that Gambrel was the KIRIS building coordinator for BCHS in 1996. Further, although the EPSB agreed with the hearing officer that Gambrel and Thompson were guilty of encouraging teachers to clarify test questions, allowing the use of

the student accountability scale, and inappropriately scheduling extended time testing, the EPSB disagreed with the hearing officer's conclusion that these actions did not constitute misconduct, willful neglect or incompetency pursuant to KRS 161.120(1)(a) or a violation of state school regulation pursuant to 704 KAR 20:680, Section 1(3)(c)1. (maintaining the dignity and integrity of the profession.) Consequently, the EPSB suspended Gambrel's teaching certificate and endorsements for twelve months and Thompson's for eighteen months.

On appeal to the circuit court, Gambrel and Thompson argued there was insufficient evidence that Gambrel was the building coordinator for the school and that Thompson's failure to exercise appropriate leadership caused the BCHS staff to be ill-prepared to administer the test. They also argued that there was insufficient evidence to find that they committed misconduct in office, willful neglect or a violation of a state school law or regulation pursuant to KRS 161.120(1)(a) because there was no evidence that they specifically intended to violate the KIRIS assessment practices.

The circuit court affirmed in part the EPSB's decision, finding that Thompson's failure in leadership resulted in the BCHS staff being ill-prepared to administer the test. The circuit court also affirmed the EPSB's conclusion that Thompson's violations of the assessment practices amounted to incompetency and a violation of a regulation (704 KAR 20:680, Section 1(3)(c)1.) under KRS 161.120(1)(a). The circuit court, however, reversed the EPSB's ruling that Gambrel's and Thompson's actions rose to the level of misconduct or willful neglect. The court adjudged that, although Gambrel and Thompson did violate certain of the appropriate KIRIS assessment practices, in order to find them guilty of misconduct or

willful neglect, the evidence had to show that Gambrel and Thompson knew that the assessment practices were prohibited and specifically intended to violate them. The circuit court also reversed the EPSB's finding that Gambrel was the building coordinator for BCHS, citing a lack of substantial evidence thereof. Finally, the circuit court reversed the EPSB's finding that Gambrel's actions constituted incompetency and a violation of 704 KAR 20:680, Section 1(3)(c)1. Hence, the court dismissed the charges and resulting sanctions against Gambrel. As to Thompson, the court remanded the matter to the EPSB to determine if the eighteen-month suspension was appropriate in light of the charges that remained. This appeal by the EPSB and cross-appeal by Thompson followed.

■ The EPSB first argues that the circuit court erred in adjudging that there was insufficient evidence that Gambrel was the building coordinator for BCHS. The basic scope of judicial review of an administrative action is concerned with the question of arbitrariness. *Kaelin v. City of Louisville*, Ky., 643 S.W.2d 590 (1982). If there is substantial evidence in the record to support an agency's factual findings, the findings will be upheld on appeal, even though there may be conflicting evidence. *Kentucky Commission on Human Rights v. Fraser*, Ky., 625 S.W.2d 852 (1981). In its role as finder of fact, an administrative agency has great latitude in evaluating the evidence and judging the credibility of the witnesses. *Aubrey v. Office of the Attorney General*, Ky. App., 994 S.W.2d 516 (1998). However, questions of law are subject to *de novo* review. *Palmore v. Swiney*, Ky.App., 807 S.W.2d 950 (1990).

The instruction manual for assessment coordinators of the KIRIS states the following:

[T]he instructions in this manual and in the *Instruction Manual for Test Administrators* must be followed closely by district assessment coordinators, building coordinators/principals, and test administrators. All assessment coordinators should read and be familiar with the instructions given in both this manual and in the *Instruction Manual for Test Administrators.* Test coordination responsibilities are divided as outlined on page 8 between the district assessment coordinator and a building coordinator (usually the principal or a guidance counselor.) If no building coordinator is appointed, then the district assessment coordinator will assume the responsibilities of both district assessment coordinator and building coordinator.

According to the assessment coordinator instruction manual, the district assessment coordinator ("DAC") serves as the "liaison between the KDE, Advanced Systems [the company that formulated the KIRIS test], building coordinators, and test administrators (classroom teachers in most cases.)" The DAC's duties include being a resource to the building coordinators and test administrators, coordinating all test activities in the district, and organizing and conducting building coordinator training sessions. The duties of the building coordinator ("BC") are listed in the assessment coordinator instruction manual as follows:

* develops a testing schedule;

* distributes materials to test administrators and meets with them to answer any questions they may have;

* sees that testing procedures (including guidelines for test modifications for special education students) are followed;

* returns a completed *Principal's Certification of Proper Test Administration* form; and

* collects and returns all test materials to the district assessment coordinator.

It was undisputed that Pat Bingham was the DAC for Bell County from 1992–1996.[2] According to the evidence, it was the policy of Bell County that a BC would be appointed after consultation with the school principal and the DAC. Apparently, that policy was not followed at BCHS in the 1995–1996 school year. Bingham testified that she did not know that she had been assigned BC for that year. Thompson testified that he usually delegated the duties of BC to the guidance counselors. During the 1995–1996 school year, the guidance counselors at BCHS were Theresa Capps and Connie Williams. There was evidence that in the fall of 1995, Thompson had indicated to the Central Office that Capps would be the BC. However, after Christmas 1995, Thompson expressed to Gambrel that he had doubts about whether Capps and Williams could handle the duties of the BC since they were new to BCHS and asked if she would help. Gambrel agreed to help, responding that she had a computer disc that contained all of the information of the BC from the previous year's KIRIS test. At the hearing Thompson testified:

[And] that's when I went to Sue [Gambrel] and again, I don't remember exactly how I said it, but it was along the line of what Sue has testified and you know, Sue, we've got a pickle here, I need your help, can you do this, and I knew that Sue had assisted Steve Baker in the year before, do this thing, so when I, when I said I need you to really work on the schedule, help us right here, if I recall correctly, I indicated that Theresa and Connie would help, you know, they would be working as a team is what I envisioned for that to happen, that

---

2. Bingham was one of the individuals who was charged and settled in this case. She

agreed to a six-month suspension of her certificate.

Theresa and Connie would be working with Sue. I knew that Sue could handle the, the scheduling. I had every, you know, Sue was my go-to person when I, when something had to be done, I would go to Sue and I knew that she had every bit of confidence in the world that she could pull this thing together, organize this thing, and with Connie and Theresa, both of them having previous experience of administering the KIRIS, I thought we was [sic] in good shape, you know, but I knew that together, the two (2) counselors, or I felt like they, based on my observation and that's what I do as principal is observe a lot, that this would be the best direction for us to go that particular year.

During the investigation of the test violations, Thompson indicated to Jim Jackson, one of the KDE's investigators, that Gambrel was the BC for BCHS, which was consistent with his testimony above that she was his "go-to" person regarding the test. Also the superintendent of the Bell County schools, as well as the staff at BCHS, understood that Thompson had assigned Gambrel to be the BC. Capps and Williams testified that Thompson never asked them to be the BC, although Capps was placed in charge of make-up testing and performance events testing and Williams was put in charge of extended-time testing. Both Capps and Williams identified Gambrel as the BC. Gambrel herself ultimately conceded to Jackson during the investigation that she was the BC.

It was undisputed that the 1996 test materials, including the instruction manual for assessment coordinators and the instruction manual for test administrators were delivered to Gambrel's office and that she prepared the test schedule and made staff and room assignments. Six days before the test, Gambrel also conducted a meeting with teachers during which she distributed test booklets, instruction manuals, the test schedule, make-up information, and the student accountability scale which will be discussed further below.

From our review of the evidence, there was substantial evidence that Gambrel was the BC for BCHS in 1996. Although the title of BC may not have been officially bestowed upon her and she may have shared some of the duties with Capps and Williams, Gambrel performed the major duties of a BC, she was considered by the principal and the teachers to be the BC, and she admitted to an investigator from the KDE that she was the BC. Accordingly, the circuit court erroneously reversed the EPSB's conclusion to that effect and, thus, we reinstate that determination.

■ EPSB next argues that the circuit court erred in requiring a finding that Gambrel and Thompson specifically intended to violate KIRIS appropriate assessment practices in order to find them guilty of misconduct under KRS 161.120. KRS 161.120(1)(a), as it existed in 1996, provided:

Any certificate issued under KRS 161.010 to 161.100, or any certificate or license issued under any previous law to superintendents, principals, teachers, supervisors, directors of pupil personnel, or other administrative, supervisory, or instructional employees may be revoked by the Education Professional Standards Board for immorality, misconduct in office, incompetency, violation of the school laws of the state or administrative regulations adopted by the State Board for Elementary and Secondary Education, willful neglect of duty, ...

Within the KIRIS assessment materials was an appropriate assessment practices form which contained information on permitted and prohibited practices in administering the KIRIS test. The assessment coordinator's and administrator's instruc-

tion manuals also contained information about how the test was to be administered and what was and was not allowed. It is undisputed that the following violations of appropriate assessment practices occurred:

* Thompson encouraged teachers to assist students in understanding the KIRIS test questions.

* Gambrel and Thompson knew of the use of a student accountability scale created to encourage student performance.[3]

* Gambrel and Thompson scheduled extended-time testing which gave students unmonitored breaks and allowed students to move, unmonitored, to another testing area with their test booklets.

The EPSB maintains that the above violations of the appropriate assessment practices constituted misconduct under KRS 161.120(1)(a). While Gambrel and Thompson admit they are guilty of the above violations of appropriate KIRIS assessment practices, they insist that such conduct does not rise to the level of misconduct because they did not specifically intend to violate the assessment practices, which was the reasoning used by the circuit court in reversing the EPSB's decision on this issue.

Gambrel testified that she did not read the assessment coordinator instruction manual, the test administrator instruction manual, or the appropriate assessment practices form. She claims that she delegated that duty to Capps and Williams, telling them that she did not work in the area of assessment. Therefore, she was unaware that the above testing practices were prohibited. Thompson testified that he had read both the assessment coordinator and test administrator instruction manuals and was familiar with the appropriate assessment practices form. He main-

tained, however, that he in good faith believed that the assessment practices in question were permissible according to his interpretation of KIRIS assessment materials.

Unfortunately, there is no definition of "misconduct" within KRS Chapter 161. In *Kentucky State Board of Education v. Isenberg,* Ky., 421 S.W.2d 81, 84 (1967), involving alleged misconduct by school board members pursuant to KRS 156.132 and 156.134, the Court stated, " 'misconduct in office' means to conduct amiss; bad behavior." The Court then went on to quote from *Gover v. Stovall,* 237 Ky. 172, 35 S.W.2d 24, 26 (1931), as follows:

> The word (misconduct in office) has a broad scope, and is more comprehensive than "immoral conduct" or "immorality," since the acts composing them must necessarily be immoral in nature. But conduct might not be intrinsically immoral and yet be "misconduct" as growing out of the status and social relationship of the one engaged in it. According to the text in 40 C.J. 1220, it is defined as: "Bad behavior; improper conduct; mismanagement; or wrong conduct, in usual parlance, a transgression of some established and definite rule of action, where no discretion is left, except what necessity may demand."

*Id.* In another case involving alleged misconduct by school board members, our Supreme Court stated:

> The lower court found "no evidence of any willful, knowing, calculated or arrogant disregard and disrespect for the local Board's obligations under KRS 162.160." Instead, the trial judge classified the construction and occupation of the field house without the prior approval that KRS 162.160 requires as "a

---

**3.** This was a scale devised by BCHS staff outside the parameters of the appropriate KIRIS assessment practices which gave points to students based on their effort, motivation, and constructive use of time in completing the KIRIS test.

shocked and embarrassed realization by the local [school board] officials that someone had fumbled the ball." The failure to abide by KRS 162.160 was characterized by the trial judge as merely a "break down in communication."

. . .

The trial judge conceded that the evidence of appellees' misconduct was true and correct; however, he then found the appellees to have been in substantial compliance with the statutes. While substantial compliance may be appropriate in regard to some areas of the law, the test is quite inappropriately applied in this given fact situation. There is no basis for the use of the substantial compliance test. Either the appellees did or did not violate the statutes; and if they did, they can, and must be removed. *State Board for Elementary & Secondary Education v. Ball,* Ky., 847 S.W.2d 743, 749 (1993).

As to Gambrel, we have no problem agreeing with the EPSB that her conduct constituted misconduct under KRS 161.120(1)(a). She never bothered to read any of the instruction manuals or the appropriate assessment practices form, instead delegating the job and never following through to see that the teachers were properly trained and testing procedures were followed.[4] Although Gambrel claims to have been unaware that she was the BC and therefore did not believe that reading the manuals was part of her job in seeing that testing procedures were followed, her delegation of that duty demonstrates otherwise. If she had read the instruction manuals and the appropriate assessment practices form, she, first, would have known that the duties of the BC included seeing that the appropriate assessment

practices were followed and, secondly, that the testing practices at issue were prohibited, as we shall discuss further below. Gambrel cannot benefit from her ignorance. *See Freeman v. Louisville and Jefferson County Planning and Zoning Commission,* Ky., 308 Ky. 360, 214 S.W.2d 582 (1948) (wherein it was held that ignorance of the law is not a valid defense.) Further, although Gambrel told teachers to read the appropriate assessment practices form and sign it, Gambrel never conducted or saw to it that any training session was held where the teachers were instructed on and able to discuss the appropriate assessment practices.

■ We now address Thompson's claim that he in good faith believed the testing procedures at issue were not forbidden. Under the heading "Test Administration" in the instruction manual for test administrators, it states, "With the exception of approved pre-existing modifications, you should not aid any student in reading, understanding, or answering any of the test questions." In the proctoring guide contained within the appropriate assessment practices form, it states in pertinent part:

> Proctors for the KIRIS Transitional (On-demand) Assessment are generally allowed to maintain an atmosphere conducive to the successful completion of the KIRIS assessments so long as no information about the content of answers is provided to the students.

Under the heading, "Proctors cannot," the proctoring guide states in pertinent part:

> * Read the questions to students (unless in special cases as specified in the manual.)

---

4. We are by no means saying that Gambrel could not delegate certain of her duties as BC. However, when one delegates certain functions of the job, it is axiomatic that the dele-

gating individual has a duty to follow through to see that those functions are being carried out.

\* Answer questions related to the response (*no hints, restatements, reinterpretations, rephrasing for clarification.*) (emphasis added.)

As to the appropriate assessment practice violation for encouraging test administrators to help students understand the test questions, we believe the above language clearly forbids such conduct such that Thompson cannot legitimately claim that he in good faith believed that helping students understand the questions was permissible. Further, common sense dictates that if the test administrator cannot even read a question to the student, then he certainly cannot explain a question. In his testimony at the hearing, Thompson also attempted to justify his belief by pointing out that helping students understand questions had always been an accepted practice in years past at BCHS. We would note that this kind of thinking is what perpetuates incompetent practices within our schools.

The same goes for Thompson's and Gambrel's knowledge of the student accountability scale. Among other things, the student accountability scale gave points to students for asking for assistance from test administrators during testing. Hence, allowing the use of the student accountability scale also constituted misconduct under KRS 161.120(1)(a).

The violations regarding the extended-time testing stem from the fact that students were permitted to have unmonitored breaks and move unmonitored to other areas with their test booklets. The instruction manual for test administrators states that "[s]tudents should not be allowed to discuss any portion of the test during the break." Throughout the instruction manual for test administrators, it emphasizes that after a portion of the test has been completed, that all testing materials should be collected and kept in a secure location. In our view, Gambrel and Thompson should have known from the above-stated provisions that students should not have been allowed any opportunity to discuss the test before that section of the test had been completed and should not have been allowed to take test materials from a testing area while unsupervised.

Finally, there was evidence that certain teachers approached Thompson during the testing and questioned the practices of helping students understand test questions and allowing students to move unmonitored to extended-time testing areas with their test booklets. It is undisputed that Thompson essentially dismissed these concerns and allowed the practices to continue.

In sum, there were definite rules regarding the KIRIS testing procedures which left no room for discretion and of which Gambrel and Thompson had a duty to be aware as the building coordinator and principal of BCHS. In our view, Gambrel's ignorance of these rules and Thompson's failure to insure that these rules were followed rose to the level of misconduct. Accordingly, we reverse the circuit court's determination that Gambrel and Thompson were not guilty of misconduct under KRS 161.120(1)(a) and reinstate the EPSB's finding to the contrary.

■ The EPSB's final argument is that the circuit court erred in reversing the EPSB's determination that, pursuant to KRS 161.120(1)(a), Gambrel was guilty of incompetence and violating a state school law or regulation. The regulation which the EPSB found Gambrel and Thompson in violation of is 704 KAR 20:680, Section 1(3)(c) which provides:

Section 1. Certified Personnel in the Commonwealth:

(3) Shall strive to uphold the responsibilities of the education profession, including the following obligations to stu-

dents, to parents, and to the education profession:

(c) To the education profession:

1. Shall exemplify behaviors which maintain the dignity and integrity of the profession.

The circuit court affirmed the EPSB's finding of incompetence and a violation of the above regulation as to Thompson, but reversed the same finding as to Gambrel, stating there was not substantial evidence thereof.

"Incompetency" has been defined as:

Of public officer:—the absence of a physical, moral, or intellectual quality, incapacitating one to perform the duties of his office, characterized by gross neglect of duty or gross carelessness in the performance of duty, lack of judgment, and want of sound discretion.

BALLENTINE'S LAW DICTIONARY 602 (3d ed.1969).

For the same reason that we believe Gambrel was guilty of misconduct under KRS 161.120(1)(a), we likewise believe that Gambrel was guilty of incompetency and violating 704 KAR 20:680, Section 1(3)(c)1. Gambrel's failure to read any of the KIRIS instructional materials when she was the BC constituted, at the very least, incompetency—gross neglect of duty, lack of judgment, and want of sound discretion—and was an affront to the integrity of her profession. Accordingly, we again reverse the circuit court and reinstate the findings of incompetency and a violation of a state school regulation as to Gambrel.

■ We now turn to the cross-appeal. Thompson argues that the circuit court erred in sustaining the charges of incompetency against him under KRS 161.120(1)(a) and in finding there was substantial evidence that he failed to exercise appropriate leadership relative to the 1996 KIRIS test. We deem these two argu-

ments to be inextricably connected and, thus, will address them as one.

Thompson insists that his education, clean past record, dedication to his profession, and years of hard work preclude a finding of incompetency in this case. While those qualifications are commendable, they do not negate Thompson's acts of malfeasance and nonfeasance as to the 1996 KIRIS test at BCHS. For the same reasons Thompson was guilty of misconduct under KRS 161.120(1)(a), we agree with the EPSB and the circuit court that Thompson's conduct demonstrated incompetency—gross carelessness, lack of judgment, and want of sound discretion.

As principal, Thompson had a duty to see that the KIRIS test was properly administered. In fact, at the conclusion of the test, the principal must sign the *Principal's Certification of Proper Test Administration* attesting to that fact. Although Thompson claimed to have read the instruction manuals and to have been familiar with the appropriate assessment practices, he nevertheless allowed conduct which clearly was in violation of the appropriate assessment practices. Concerns over certain of the violations were even brought to his attention during the testing and he maintained that such practices were permissible and allowed them to continue. As with the finding of misconduct, Thompson's alleged good faith belief that the assessment practices at issue were permissible does not preclude a finding of incompetency. Thompson, as an educated school administrator, should have known from the instruction manuals and the appropriate assessment practice form that the conduct at issue was prohibited, especially the practice of helping students understand test questions which was expressly forbidden.

We also agree that Thompson's conduct demonstrated a failure in leadership re-

garding administration of the KIRIS test which we believe was further evidence of incompetency. First, if Thompson had demonstrated appropriate leadership skills, there would have been no question as to who the BC was. Secondly, if Thompson had followed through with his delegation of BC duties, he would have known that all of the duties of the BC were not being carried out—that no one was seeing to it that the test administrators were being trained as to appropriate assessment practices and that these assessment practices were being followed.

Thompson's remaining argument is that the circuit court erred in upholding the EPSB's finding that his conduct was a violation of 704 KAR 20:680, Section 1(3)(c)1. as set out earlier. As the leader of the school, Thompson had an obligation to see that the duties he delegated were fully and properly performed. We agree with the EPSB and the circuit court that Thompson's failure to follow up on the delegation of KIRIS testing duties and the failure to insure that the staff was properly trained as to the appropriate assessment practices was behavior which did not maintain the integrity of his profession.

For the reasons stated above, the judgment of the Franklin Circuit Court is affirmed in part and reversed in part such that the final order of the EPSB is hereby reinstated in full.

ALL CONCUR.