David MIKE, Appellant

v.

DEPARTMENT OF EDUCATION, Commonwealth of Kentucky; Jefferson County Board of Education; and Donna Hargens, Superintendent, Appellees

NO. 2016-CA-000029-MR

Court of Appeals of Kentucky.

MARCH 10, 2017; 10:00 A.M.

Discretionary Review Denied by Supreme Court August 16, 2017

BRIEFS FOR APPELLANT: William J. Walsh, Louisville, Kentucky.

BRIEF FOR APPELLEES, JEFFERSON COUNTY BOARD OF EDUCATION AND DONNA HARGENS, SUPERINTENDENT: Byron E. Leet, Lisa C. DeJaco, Amanda Warford Edge, Louisville, Kentucky.

BEFORE: ACREE, J. LAMBERT AND THOMPSON, JUDGES.

OPINION

THOMPSON, JUDGE:

David Mike appeals from an opinion and order of the Jefferson Circuit Court affirming the decision of a statutory administrative tribunal (the Tribunal) convened by the Kentucky Department of Education which determined Mike engaged in conduct unbecoming a teacher and, therefore, was properly terminated by the Jefferson

County Board of Education. Mike argues his conduct was not unbecoming a teacher as that term is used in Kentucky Revised Statutes (KRS) 161.790(1)(b) providing that a teacher's employment contract shall not be terminated except for those causes listed.

Mike began his career in the Jefferson County Public Schools in 1995 as a teacher. In 2000, he became an assistant principal at Seneca High School. From 2005-2008, Mike was principal at Kennedy Metro School and, from 2008-2013, was the principal at Western High School. In the summer of 2013, Mike became the principal at Louisville Male High School.

In September 2013, Mike and other faculty and staff members at Male acknowledged in writing that they "received, read, and will comply with" the Administration Code for Kentucky's Educational Assessment Program, 703 Kentucky Administrative Regulations (KAR) 5:080, for the school year 2013-2014. The allegations against Mike consisted of violations of that Code by creating or implementing activities for the purpose of increasing test scores and, directly or indirectly, improperly assisting students in taking assessment tests.

The events leading to Mike's termination began in the fall of 2013 when computers in a lab room at Male (Room 108) were used to take two different tests published by ACT. One test, the Compass 3.2 test, is a standalone placement test installed through Windows. The test is used to assess whether a student is ready for dual credit college programs. The second, the ACT Compass internet test, is an untimed internet-based test designed for teachers to assess 12th grade students' college readiness in reading, writing skills and math who have not met the state's benchmarks in those areas. Students may take this test twice with a minimum of five instructional days between tests. While the tests are different and have different purposes, they share some of the same questions contained in a databank that can be used again.

After the Compass 3.2 test software was installed, Deborah Greenburg, who worked with Mike at prior schools and then at Male, was assigned by Mike to oversee testing in Room 108. She organized the testing lab, passed out schedules for proctors and students, called students from class for testing, arranged seating in Room 108 and kept all testing materials.

According to Mike and other staff members, they believed the Compass 3.2 test was a practice test for preparing to take the ACT Compass internet test. Students were permitted to take the Compass 3.2 test multiple times until each reached a proficiency level set by Greenburg that was ten points above the passing score for the ACT Compass internet test.

On December 6, 2012, ACT (the non-profit company that publishes and scores ACT college readiness tests) investigative staff reported to the Kentucky Department of Education (KDE) that it received two hotline reports of students receiving impermissible assistance on ACT tests at Male. ACT investigators and a KDE investigator went to Male to investigate and were later joined by a Jefferson County Board of Education investigator.

As a result of the investigation, ACT sent Mike a letter informing him its investigation was concluded. It determined that students copied items from the Compass 3.2 test, Male teachers assisted students taking the Compass 3.2 test and students took the test multiple times as a practice test for the ACT Compass internet test. The letter set out an eight-point list of actions to be taken by Mike and Male, including that the Compass 3.2 test soft-

ware be uninstalled from the computers. The letter also instructed that "[a]ll notes taken by either [Male] students or staff that contain portions of the ACT Compass question, response choices, or solutions to ACT Compass questions must be collected and returned to [ACT] via secure carrier." As a result of security breaches during testing, the fall 2013 ACT Compass internet test results were invalidated.

Following receipt of ACT's letter, Mike and other teachers took training regarding administering standardized tests and KDE Compass Proctor training was given. At this point, the ACT investigation seemed complete. However, allegations resurfaced in the spring of 2014, concerning the integrity of the testing procedure and Mike's attempt to cover up irregularities.

At Mike's urging, Male became overstaffed causing dissension among the faculty and students. Soon thereafter, in the spring of 2014, allegations emerged that Mike attempted to influence students' statements before speaking with ACT and KDE investigators. Additionally, teacher Sarah Graziano Portman reported that after she learned of the letter to Mike from ACT, she inquired what she should do with student notebooks used in Room 108 which were locked in a cabinet. Mike told her to "put them in a bag, take them home, and get rid of them a few at a time." She ignored his request and gave the notebooks to the ACT investigator.

ACT and KDE returned to Male in May 2014 and, after investigating the ACT testing procedures, stripped Mike of any authority to access, administer, or oversee testing without ACT's written permission. The KDE then issued a "Kentucky Assessment Allegation Report" finding, in part, that Mike coached witnesses before being interviewed by ACT and KDE investigators. It further found that Mike violated 703 K.A.R. 5:080, specifically, that the

Compass 3.2 test was taken to increase ACT Compass internet test scores and students were impermissibly assisted by students and teachers. The report also found that students were improperly directed to take notes from the Compass 3.2 test back to teachers for help and took the test until reaching a proficiency level ten points above the passing score for the ACT Compass internet test. Additionally, the staff at Male did not participate in the training updates for Compass assessment before the tests were given in the fall of 2013. The report recommended that Mike's name be sent to the Kentucky Education Professional Standards Board, and ordered that Mike have no further involvement in the administration of any ACT products. The report noted that there was a significantly large increase from previous years in students' ACT Compass internet test scores at Male in the fall of 2013.

On July 25, 2014, Donna Hargens, Superintendent of Jefferson County Public Schools, requested an investigation by the Jefferson County Board of Education. In addition to finding violations of Kentucky regulations governing the integrity of standardized testing, the Board substantiated allegations that Mike instructed a teacher to dispose of the student notebooks used in Room 108 and that Mike suggested a student lie to ACT investigators.

In addition to the evidence recited above, witnesses described the atmosphere in Room 108 during testing as chaotic. Students and faculty tutors were present to help students with the Compass 3.2 test and students had notebooks to assist them. However, Mike testified that he was an active principal and walked though Room 108 and saw nothing amiss. Superintendent Hargens terminated Mike on October 28, 2014.

Mike challenged his dismissal pursuant to KRS 161.790 and, in accordance with

that statute, the Tribunal comprised of one teacher, one school administrator, and one lay person all of whom resided outside the school district, heard testimony and determined Mike engaged in conduct unbecoming a teacher and was properly terminated. KRS 161.790(4). Mike appealed to the Jefferson Circuit Court which affirmed. He then appealed to this Court.

■ The process for the termination of public school teachers is governed by KRS 161.790. The role of the Tribunal and the reviewing court was explained in *Bd. of Educ. of Fayette Cty. v. Hurley-Richards*, 396 S.W.3d 879, 882 (Ky. 2013):

> KRS 161.790(4)–(9) provides for the selection of an *ad hoc* hearing Tribunal to conduct an administrative evidentiary hearing. The Tribunal makes findings of fact, determines whether grounds for termination have been proven, and renders a final order accordingly. The decision of the Tribunal is a final order, subject to judicial review by the circuit court in accordance with KRS Chapter 13B. KRS 13B. 150(2) requires the courts to give deference to agency fact finding: The court shall not substitute its judgment for that of the agency *as to the weight of the evidence on questions of fact,* except in the limited circumstances identified in subsections (a)–(d) of KRS 13B.150(2).

(emphasis original) (footnotes and internal quotations omitted). In summary, "the role of the Tribunal, as the finders-of-fact, [is] to determine 'what happened' and as the adjudicative body with original jurisdiction, to apply the law and if appropriate grounds are found, decide upon the appropriate sanction." *Id.* at 884. Issues of law are considered *de novo. Id.* at 885.

■ Among the causes listed in KRS 161.790(1)(b) for which a teacher may be terminated is "conduct unbecoming a teacher[.]" Mike contends that there was

insufficient evidence to support the Tribunal's finding that he engaged in conduct unbecoming a teacher without a finding that he knew of and did not prevent the security breaches in the testing procedures. He maintains that his conduct must have amounted to more than mere negligence or a failure to meet a standard of care to justify his termination. As a matter of statutory interpretation, we review this issue *de novo. Hurley-Richards,* 396 S.W.3d at 885.

In *Hurley-Richards,* the Court addressed the meaning of the term "conduct unbecoming a teacher" as used in KRS 161.790(1)(b). It stated as follows:

> Although conceptually broad compared to some of the other grounds for termination listed in the statute, conduct that fits within this definition will be conduct that violates the accepted norms of decent behavior and offends the sensibilities of reasonable persons, taking into account the role of a secular, public school teacher in our culture. Teachers are reasonably expected to serve as role models and exemplars for their students, and they typically do. For this reason, whether the conduct in question occurred during school hours, on school property, or directly affects the teacher's ability to perform his duties cannot be the sole determinative factors, but are certainly relevant circumstances to be considered. Instead, the determinative factor is whether the conduct offends the sensibilities of reasonable persons under the circumstances.

*Id.* at 887 (footnote omitted).

Mike points out that the majority of cases addressing whether a teacher's conduct was "unbecoming" and justified termination have involved intentional, and sometimes criminal acts, committed by teachers. For example, in *Drummond v.*

*Todd Cty. Bd. of Ed.*, 349 S.W.3d 316 (Ky. App. 2011), the terminated teacher engaged in a sexual act with a student. In *Bd. of Ed. of Hopkins Cty v. Wood*, 717 S.W.2d 837 (Ky. 1986), two teachers were properly terminated after smoking marijuana with two fifteen year old girls. Finally, in *Bd. of Ed. of Laurel Cty. v. McCollum*, 721 S.W.2d 703 (Ky. 1986), a teacher's termination was upheld when the teacher engaged in criminal conduct by falsely swearing in an affidavit that he was ill on a particular day.

While the cases cited involved intentional acts and perhaps more culpable acts than those engaged in by Mike, "conduct unbecoming a teacher" does not necessarily mean intentional conduct. The dominant factor is whether "the conduct offends the sensibilities of reasonable persons under the circumstances." *Hurley-Richards*, 396 S.W.3d at 887. As noted by our Supreme Court, "the statute does not require an intent to harm students." *Id.* at 888.

This Court has previously recognized that unintentional conduct may support disciplinary action against a teacher. In *Kentucky Ed. Professional Standards Bd. v. Gambrel*, 104 S.W.3d 767 (Ky. App. 2002), this Court specifically addressed the appropriateness of disciplinary action by the Education Professional Standards Board against a principal and teacher based on irregularities in testing procedures and the defenses that their conduct was unintentional and spawned from ignorance of the procedures.

Thompson, the school principal, and Gambrel, the building coordinator for the KIRIS assessment at the school, were found "guilty of encouraging teachers to clarify test questions, allowing the use of the student accountability scale, and inappropriately scheduling extended time testing[.]" *Id.* at 770-71. On appeal, Thompson and Gambrel argued that "such conduct [did] not rise to the level of misconduct because they did not specifically intend to violate the assessment practices[.]" *Id.* at 774.

Rejecting that good faith or ignorance was a defense to their discipline based on misconduct, this Court did not focus on what Thompson and Gambrel knew, but on their duties in administering and overseeing the testing procedure and the information they should have known. Specifically, as to Thompson, the Court held that "[a]s the leader of the school, Thompson had an obligation to see that the duties he delegated were fully and properly performed." *Id.* at 778. This Court reasoned as follows:

> [T]here were definite rules regarding the KIRIS testing procedures which left no room for discretion and of which Gambrel and Thompson had a duty to be aware as the building coordinator and principal of BCHS. In our view, Gambrel's ignorance of these rules and Thompson's failure to insure that these rules were followed rose to the level of misconduct.

*Id.* at 776.

The ACT Compass internet test, like all standardized testing in our public schools designed to measure academic progress, is deemed a highly valuable tool to assess the successes or failures of our public schools. The integrity of the testing procedures must be guarded by school authorities and, as observed in *Gambrel*, that duty falls upon the principal. In summary, as principal of Male, Mike had the duties to administer and oversee the testing procedures and, if delegated, the duty to see that those duties were properly carried out, including properly securing the testing. However, the termination of a teacher requires more than misconduct. It requires "conduct unbecoming a teacher."

We might be inclined to agree with Mike that mere negligence in overseeing that testing is done in accordance with stated procedures might fall short of the necessary conduct to support termination. However, Mike's argument becomes inconsequential when viewed in light of the entirety of the evidence. The evidence showed more than mere negligence in his oversight of the testing. There was evidence that Mike's conduct was not completely unintentional in that he attempted to influence witnesses and keep evidence from coming into the hands of the ACT investigators. The Tribunal was persuaded by this evidence finding that Mike directed Portman to discard student notebooks contrary to ACT's instructions and attempted to influence her statements to ACT as well as those of a student.

While Mike suggests that some of the witnesses were not credible and motivated to lie because of the dissension at Male caused by Mike's overstaffing decisions, as the fact-finder, the Tribunal had the ultimate responsibility to weigh the evidence and access the credibility of witnesses. The Tribunal specifically addressed Mike's concern and found there was no evidence that the witnesses had any retaliatory motive to be untruthful.

We conclude Mike's attempts to hide evidence and influence witnesses during the investigations into the testing procedures fall within the meaning of KRS 161.790(1)(b) in that it is conduct which "offends the sensibilities of reasonable persons under the circumstances." *Hurley-Richards*, 396 S.W.3d at 887. This evidence, combined with evidence that the testing procedures at Male in the fall of 2013 were improper, is sufficient to affirm the conclusion that Mike's termination for conduct unbecoming a teacher was justified.

Based on the foregoing, the opinion and order of the Jefferson Circuit Court is affirmed.

ALL CONCUR.